**L. F. STRASSHEIM COMPANY, a Wisconsin corporation doing business as Bowling Green Chair Company, Plaintiff,**

v.

**GOLD MEDAL FOLDING FURNITURE COMPANY, a Wisconsin corporation, Defendant.**

**No. 64–C–74.**

United States District Court
E. D. Wisconsin.

June 14, 1968.

Donald C. Heide, Kenosha, Wis., Charles B. Cannon, Chicago, Ill., for plaintiff.

James E. Nilles, Milwaukee, Wis., for defendant.

## OPINION

TEHAN, District Judge.

This is a civil action for a declaratory judgment to invalidate two United States patents. L. F. Strassheim Company, a Wisconsin corporation doing business as the Bowling Green Chair Co. is the plaintiff, and Gold Medal Folding Furniture Company, also a Wisconsin corporation, is the defendant. The defendant has counterclaimed for injunctive relief and damages arising from the plaintiff's infringement of the two patents. The cause of action for a declaratory judgment arises under Title 28 U.S.C. § 2201, with jurisdiction conferred on this court by Title 35 U.S.C. §§ 101, 102, 103 and 171. The defendant's cause of action for patent infringement arises under Title 35 U.S.C. § 281, with jurisdiction conferred by Title 28 U.S.C. § 1338(a). Venue is properly laid in the Eastern District of Wisconsin.

Defendant is the owner of the entire right, title and interest in United States Patent 2,699,816 (hereinafter referred to as '816), applied for December 28, 1953 and issued January 18, 1955 on a "Chair Back," and United States (Design) Patent D189343 (hereinafter referred to as '343), applied for December 2, 1958 and issued November 29, 1960 on a "Collapsible Chair", both assigned to the defendant company. The patented features of the chair at issue here are

the fitting of a flexible fabric back rest ('816) and the design of the armrest and upright supporting spindle ('343).

Plaintiff claims invalidity of the two patented features as well as misuse of patent '816. One basis of its claim of invalidity against each patent is obviousness, under 35 U.S.C. § 103, which it seeks to prove by prior art; in addition, the plaintiff asserts public use of the patented feature ('816) of the chair more than a year prior to filing of its application for the patent and misrepresentation by the defendant in applying for patent '816. The plaintiff has admitted infringement—but not of a wilful and wanton nature—insofar as the patents are declared valid by this court.

The matter was tried here on June 13–15, 1967. Time was allowed for preparation and submission of briefs, followed by oral arguments on February 21, 1968.

Patent '816 relates to the back of a director's-type folding chair in which the side armrest assemblies, including their backposts, can swing "outwardly and downwardly" when the restraining canvas fabric back panel is removed from the backposts. The back panel contains loops formed along the entire edge of both ends. Each loop slips over its corresponding back post, leaving an acorn at the top of each post exposed. Each post has a notch just below the acorn, forming an upwardly facing shoulder. A welt or hem formed on the inside of each panel, slips into the notch, thereby inhibiting slippage of the back panel. The back panel is uniformly tensioned along its height on the posts and the tension of the panel is evenly distributed along each post.

Director's chairs without the instant invention, had been made for several years by defendant and its competitors prior to the application for the '816 patent. The sagging of the back panel, prior to the '816 invention, was, however, a problem for the industry. Numerous attempts had been directed at its solution, as for example, by tacking or using glove fasteners or clips, taping, sewing the top of the loops closed over the acorn of the post, or by tapering the backposts. The plaintiff itself tried applying adhesive or "varnish which was not slippery" to the posts. But none of these measures seemed fully to correct the problem of a sagging back panel.

## INVALIDITY.

The plaintiff asserts invalidity of '816 because of obviousness and lack of invention under 35 U.S.C. § 103 [1] in view of the patented prior art of U.S. Patent Nos. 1,739,552 ("Kidder"), 2,702,586 ("Borgfeldt") and 2,582,864 ("Gittings"). The latter disclosed all features of the '816 patent, except for the notch and welt feature disputed here. In the Kidder patent, there is provision for a notch, and in the Borgfeldt patent for a reduced portion of the back rest, each of which indentations seem to relate to the back panel in a manner suggestive of that in the '816 patent.

It is well-established that a patent is presumed valid and the plaintiff therefore assumes a heavy burden in challenging its validity. Accordingly, every reasonable doubt should be resolved here in favor of the defendant. Devex Corp. v. General Motors Corp., 321 F.2d 234 (7th Cir.1963). The presumption of validity is increased where an infringer in a suit for infringement cites and relies upon prior art which is no more pertinent than that considered by the Patent Office before issuing the patent. It is immaterial that the Borg-

1. That section reads as follows: "A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

feldt patent was not then before the office when it approved the defendant's patent insofar as it is in no way more pertinent than the Kidder patent, which was before the office.

To arrive at the invention of the '816 patent, more was involved than simply putting a groove in the back posts of a prior art chair. To quote the defendant "[i]t is just not a matter of putting a little notch and offering some resistance; this really locked and this is the invention." (Transcript, Oral Argument, February 21, 1968, p. 32).

Nothing in the Kidder patent nor in the earlier Gittings patent teaches us how a hidden welt in the inside of the back panel could be made to *lock* in a groove in the back post as in the '816 patent while at the same time permitting even tension of the fabric along the chair's backposts. That is, neither the Kidder patent 1,739,552 nor the Borgfeldt patent 2,702,586 shows or suggests the invention of a hidden, inside welt in an end loop of a back panel, extending substantially the full height of the panel, which can be slipped over the backposts so that the welt locks securely in a groove in the backpost, thereby providing even tension and distribution of force along the entire height of the back panel. Moreover, in both the grooved Kidder and Borgfeldt patents, contrary to '816, the tension of the back panel is localized at the points on the fabric where it is connected to the back posts.

Finally, the Borgfeldt patent 2,702,586 relied on by plaintiff is not a folding chair of the type having laterally outwardly swingable back posts. Nor does it have a back panel with end loops extending substantially the full vertical height of the panel and a hidden welt in-

side the upper edge of the loop, wherein the loops encircle the posts and in which the posts have their laterally outermost portions uniformly engaged with the corresponding internal portions of the loop, thereby permitting a substantially uniform tension upon laterally outward movement of the posts.

■ It is our conclusion that even the combination of either of the Kidder patent 1,739,552 or the Gittings patent 2,582,864 with the Borgfeldt patent 2,702,586 would not render the '816 invention (of a backpost groove combined with a *uniform tensioned* fabric back rest) obvious to a man skilled in the art at the time the instant invention was made.

We hold therefore that the subject matter of the claims of '816 and '343 was valid under 35 U.S.C. § 103, even considering all the "prior art" relied on by plaintiff.

PUBLIC USE.

■ Plaintiff contends that the evidence adduced at the trial[2] fully establishes that the defendant's chair embodying the patented features in it was in public use by the defendant more than one year before the patent application was filed. Hence it is argued that the statutory bar of 35 U.S.C. § 102(b)[3] invalidates the patent. The plaintiff has the burden of proving such use by *clear* and *convincing* proof. Devex Corp. v. General Motors, supra; see also Solo Cup v. Paper Machinery Corp., 240 F. Supp. 126 (E.D.Wis.1965). The date of application for the patent in suit was December 28, 1953. Thus the critical date in regard to the statutory bar is December 28, 1952. In regard to the public use defense, we will summarize the trial evidence and find as follows:

---

2. This evidence consisted of both trial exhibits and the plaintiff's depositions as introduced into the record, of Tannie D. Bass, Edwin W. Deering, Gordon R. Bennett, Dr. Delmar E. Solem, all taken in Coral Gables, Florida, on June 1, 1965 and John B. Gittings.

3. "A person shall be entitled to a patent unless—
    (b) The invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States * * *."

The invention of the '816 non-sag back apparently was conceived by the defendant in mid-1951. A patent application was prepared soon thereafter by one Casanave Young, a patent attorney, but that particular application apparently never was filed. The effective application for '816 was prepared by another attorney, Arthur J. Hansmann, and ultimately filed on behalf of the defendant on December 28, 1953, pursuant to instructions from defendant's officer, W. D. Gittings.

As the defendant testified, the first publication of information concerning the invention of the '816 patent was in the defendant's 1953 catalogs, which were published in or about January, 1953. Defendant did not publish 1952 catalogs, apparently because no change in production or design occurred in that year, as indicated in several pieces of 1952 correspondence admitted as evidence here. In this correspondence defendant notified its dealers that no change in production or design occurred during 1952 and that its 1951 catalog contained its most recent information on the chairs.

The subject matter of the '816 patent was publicly shown for the first time at the Chicago Furniture Show in January, 1953. It is reasonable to expect as a matter of sound business judgment that the defendant waited until this big exposition to introduce the new chair features. Chairs embodying the invention of the '816 patent were then made and sold at least as soon as orders had been received in connection with that show. It was the general custom of defendant to "make up" the chairs after orders were received in compliance with requested color of wood and fabric.

1. Testimony of Tannie D. Bass.

Mrs. Tannie D. Bass testified that she was given two red canvas, natural-varnish wood chairs by her employer, Mr. E. P. Duling of the Duling Awning Company, Coral Gables, Florida, in June or July of 1953. She identified these chairs, which were then presented as trial exhibits, as part of a shipment of chairs sent by the defendant to her employer in November, 1952. She testified that the two chairs did not conform to her employer's order of 30 white-marine-type chairs, for reshipment to its customer, the Hollywood Beach Hotel, and that because of this defect, they were retained by her employer until subsequently given to her.

In regard to Mrs. Bass's testimony, it is undisputed that the defendant did indeed send director's type chairs to the Duling Company, pursuant to an invoice dated November 19, 1952. But the record yields nothing corroborative to tie this invoice to the chairs on exhibit, which Mrs. Bass claimed, were retained by her employer and later given to her by him seven or eight months later. Indeed, the record is noticeably barren of testimony from either her employer or any officers or other responsible parties of the Hollywood Beach Hotel. Nor was any explanation given by the plaintiff for the absence of such testimony from individuals who were seemingly in a position to clarify the circumstances of the November, 1952 delivery and potentially able to corroborate Mrs. Bass's testimony. Defendant, moreover, has rebutted the plaintiff's evidence by showing that, for the chairs received by Mrs. Bass to have been those received by Duling Awning Company pursuant to the November 19, 1952 invoice, would have involved the commission of an unlikely double error by the defendant—namely, the color of canvas as well as the color of wood finish. Furthermore, such an error would have resulted in a credit to Duling. A check by the defendant of its records indicates credit was neither asked for by Duling nor given by defendant. The only credit apparently given to Duling on this transaction was in the form of a rebate for a freight overcharge of one dollar. There has been an absence, further, of any testimony concerning why these particular chairs did not sell as the others did, especially since they allegedly contained a

newly patented feature which should have facilitated their sale.

In and of itself, therefore, Mrs. Bass's testimony is not clear and convincing especially in view of the established traffic in director's chairs which Mrs. Bass's employer apparently engaged in throughout the 1950's.

2. Testimony in regard to Deering Company and Ring Theater of the University of Miami.

In mid-1952, defendant furnished 40 "35Y" director's chairs to the Deering Awning and Furniture Company, Inc. of Coral Gables, Florida, which sold them, in turn, to the University of Miami for use in the latter's recently constructed Ring Theater. In May 1965, a search was conducted on behalf of plaintiff throughout the premises of the University of Miami, including the South Campus storage, where approximately 30 or 35 chairs still remained. One chair, found under the bleachers of the Ring Theater, embodied the invention of the '816 patent in suit; this chair was identified and presented here in evidence. The plaintiff contends that this chair was among those purchased pursuant 'to the defendant's mid-1952 sale of director's chairs to the Deering Company.

But once again, the proof fails, as required, to be clear and convincing. The defendant's process for applying a mahoganitone finish to its chairs consisted of dipping the raw wood into stain; after the wood had had a chance to absorb it, the stain was rubbed into the wood. Thereafter three coats of varnish were applied. Testimony on behalf of the defendant suggests, in line with the appearance of color chips introduced at the trial by the plaintiff, that the result of its "staining" process is a mildly reddish finish which could not fade perceptively, particularly if battended down and housed indoors away from sunshine in the Ring Theater as appears in the record. It is clear from the appearance of the exhibit that the chair brought in as evidence has faded badly, thereby shedding doubt on plaintiff's contention

that the chair on exhibit at one time possessed a mahoganitone finish—doubt sufficient indeed to foreclose a characterization of this evidence as "clear and convincing" proof. Moreover, the mere appearance on the chair of several darker reddish patches, suggesting a mahoganitone finish, is inconclusive insofar as it may be attributable as one witness testified, to "color bleeding" from red canvas fabric.

Finally, a principal witness, Gordon R. Bennett, of the Ring Theater, did not know if the chairs ordered by the Deering Company in May 1952 and sent to the Ring Theater, had notches in the backpost, although he testified that some of the theater chairs had notches in them. (Transcript of Trial, p. 160) Mr. Bennett's testimony was that the chairs had back panels that kept slipping down, and that to alleviate this condition, he personally had to tack the fabric back rests to the backposts. As demonstrated at trial, the back panels of chairs made in accordance with the invention of the '816 patent do not slip down, even if a person sits in another chair and puts his feet on them; nor was any evidence introduced to show tack marks in the defendant's chair, as Mr. Bennett's testimony would contemplate. The evidence therefore in regard to the invoice of May 1952 fails clearly and convincingly to establish a relationship between the order described therein and one chair found thirteen years later under the bleachers of the theater.

■ In view of the above testimony, we hold in regard to patent '816, that the plaintiff failed to sustain its burden of clearly and convincingly proving public use, sale or placing on sale—even as broadly defined—of the patented product at issue.

### ALLEGED MISUSE.

We find that there was no misuse or unclean hands by defendant in respect of the '816 patent.

### THE DESIGN PATENT D189343

The subject matter of the design patent ('343) relates to an arm assembly

for a collapsible chair and comprises a rearwardly inclined arm rest, rearward slanting of a supporting spindle and a right angular relationship between the arm and its supporting spindle. The defendant maintains *inter alia*, that the subject matter of the '343 eliminated the square, boxy appearance found in prior art chairs, and resulted in a definite and salutary distinctiveness and freshness of appearance. Defendant further maintains that the subject matter of '343 was primarily a change in appearance and not primarily limited to utility relating to the occupant's comfort.

The plaintiff, on the other hand, contends that '343 is invalid because of what he perceives as a primarily functional, rather than ornamental, nature of the arm-rest assembly. But in asserting this contention, the plaintiff confuses the instrumental purpose of an article—which may be functional as an aid to comfort, for example—with the patented feature of the article, which we find ornamental. Further, the patented feature need not be *primarily* ornamental, as the plaintiff suggests; it suffices that the patented configuration does not involve its utility alone. Spaulding v. Guardian Light Co., 267 F.2d 111 (7th Cir., 1959) a case relied on by the plaintiff itself. We find that the prior art cited by the plaintiff is no more pertinent than that before the Patent examiner as referenced in the file wrapper. We hold that the design feature would not have been obvious to one skilled in the art of furniture design.

Finally, we are not persuaded of the relevancy of the plaintiff's distinction between *design* and *environment* as these terms purportedly correspond in the patent drawing respectively to broad-outlined and dotted out-lined configurations. To be sure, such a distinction, in the absence of explicit clarification to the contrary, is often important if not controlling in respect of the validity of a design patent. (Application of Blum, 374 F.2d 904 (C.C.P.A.1967) But here the distinction does not denigrate from the reasonableness of characterizing '343 in itself as ornamental, rather than functional, such as to permit the proper issuance by the Patent Office of a design patent. Since it appears reasonable to construe '343 as an ornamental design feature, we therefore hold that the plaintiff's attack on the design feature of Patent D189343, is without merit.

## CONCLUSION.

For the above reasons,

We hold that both Patent 2,699,816 and Design Patent D189343 are valid. The defendant is entitled to an injunction against the manufacture and sale by the plaintiff of folding chairs embodying the invention of Patent 2,699,816 and of Design Patent D189343. The defendant is entitled to an accounting and award of profits and damages from the plaintiff but is not entitled to an award of attorneys' fees and triple damages because of the insufficiency of proof that the plaintiff acted wantonly and wilfully when it infringed the defendant's patent.

Judgment shall be entered accordingly.