**JENN–AIR CORPORATION**

v.

**PENN VENTILATOR COMPANY, INC.**

**Civ. A. No. 38930.**

United States District Court,
E. D. Pennsylvania.

Feb. 28, 1975.

K. Robert Conrad, Philadelphia, Pa., C. F. Leydig, Chicago, Ill., for plaintiff.

Jacob Trachtman, Philadelphia, Pa., Dana M. Raymond, New York City, for defendant.

## OPINION

BECHTLE, District Judge.

### I. *Introduction*

This is an accounting action to assess damages against Penn Ventilator Company, Inc. (hereinafter "Penn"), for Penn's infringement of Jenn-Air Corporation's (hereinafter "Jenn-Air") U. S. Patent No. 2,548,607 claiming a centrifugal sidewall exhauster; U. S. Patent No. 3,110,357 claiming the combination of a roof exhauster and sound control curb having a single, horizontal baffle; and, U. S. Patent No. 3,085,647 claiming a sound control curb having multiple, horizontal baffles. The action is before this Court for a determination of damages pursuant to the mandate of the Court of Appeals for the Third Circuit.[1] The Court of Appeals reversed the District Court's dismissal of Jenn-Air's complaint for patent infringement and unfair competition and directed that the instant action be retried with respect to the amount of damages sustained by the plaintiff. This Opinion contains the Court's findings of fact and conclusions of law with respect to the issues raised in the present proceedings.

### II. *Findings of Fact as to Damages*

(1) U. S. Patent No. 2,548,607 ("607 patent") was issued to Louis J. Jenn on April 10, 1951. The 607 patent, which claims a centrifugal sidewall exhauster, was assigned to plaintiff corporation by Mr. Jenn by an assignment dated December 1, 1967. The accounting period for the 607 patent extends from May 10, 1962, to April 10, 1968, the date on which the above patent expired.

(2) U. S. Patent No. 3,085,647 ("647 patent") was issued on April 16, 1963, to plaintiff, which was at that time named Jenn-Air Products Company. The 647 patent claims a sound control curb having multiple, horizontal baffles. The

accounting period for the above patent extends from April 16, 1963, the date of the issuance of the 647 patent, to September 7, 1972, the date on which the injunction barring further infringement of the 647 patent was issued.

(3) U. S. Patent No. 3,110, 357 ("357 patent") was issued to Jenn-Air Products Company on November 12, 1963. Plaintiff has been the owner of 357 patent, which claims a roof exhauster in combination with a sound control curb having a single, horizontal baffle, since the issuance of said patent. The accounting period for the 357 patent extends from November 12, 1963 to September 7, 1972, the date on which the injunction restraining further infringement of the 357 patent was issued.

(4) The infringing centrifugal sidewall exhausters manufactured and sold by Penn in violation of plaintiff's rights under the 607 patent were called "Wall Mounted Domex" exhausters. The total sales of infringing "Wall Mounted Domex" exhausters over the accounting period amounted to $1,233,740, which figure includes $66,886 worth of accessories sold with the wall domex units, $85,454 in commissions, and $80,113 in freight charges paid by Penn.

(5) The infringing sound control curbs manufactured and sold by Penn were called the "Ultra Sonotrol Curbs." The manufacture and sale of the "Ultra Sonotrol Curbs" by Penn infringed the single-baffle structure of the plaintiff's 357 patent and the multi-baffle structure of the plaintiff's 647 patent. Penn's sales of all infringing "Ultra Sonotrol Curbs" (single and multi-baffle) during the accounting period amounted to $642,046. The above figure includes $44,471 in commissions and $41,691 in freight paid by Penn.

(a) Penn's sales of "Ultra Sonotrol Curbs" of the design adjudged to in-

---

lower court decision, Judge Masterson resigned from the Federal Bench. The trial on the issue of damages was then reassigned to the undersigned.

1. The opinion is reported at 464 F.2d 48 (1972). The liability phase of this case was initially tried before the Honorable Thomas A. Masterson. Subsequent to the reversal by the Third Circuit Court of Appeals of the

fringe plaintiff's 647 patent amounted to $504,462, which figure includes $34,800 in commissions and $32,800 in freight paid by Penn.

(6) Penn's sales of roof exhausters (sold in connection with and for the purpose of mounting on the "Ultra Sonotrol Curbs" sold by Penn) amounted to $1,113,912, which figure includes $60,901 worth of accessories sold with the roof exhausters, $79,936 in commissions, and $68,377 in freight paid by Penn.

(7) Penn's total sales of non-infringing power ventilating equipment on orders including one or more infringing wall domex units or "Ultra Sonotrol Curbs" were within the range of $4 million to $5.5 million. The sales of the non-infringing products were made to the same customers—as part of the same orders—who purchased the infringing items.

(8) Penn's infringement of the 357 patent consisted of the sale of sound control curbs and the roof exhausters. The acoustic curb and roof exhauster described in plaintiff's patent 357 comprise a matched set of interacting components designed, sold, and installed as one integral unit. Because the 357 patent clearly claims the combination of the roof exhauster and acoustic curb, and in light of the fact that the roof exhauster and acoustic curb were sold as one operative unit, the royalty base under the 357 patent would necessarily have included both the roof exhauster and acoustic curb.

(9) The general and customary practice of purchasers of ventilating equipment is to purchase all of the required power-driven ventilating equipment and related products from a single manufacturer. The equipment needed for a given job site is customarily specified on one order and the order or contract is awarded to a single manufacturer who has the capability of supplying all of the ventilating equipment and accessory products specified for installation at that job site.

(10) Because of Penn's ability to bid on those orders calling for the infring-

ing products, it was able to sell non-infringing products to the customer who specified and thereafter contracted to purchase the infringing items. The fact that a licensee would be able to sell the related non-infringing products would be a significant consideration in the hypothetical negotiation between a willing licensor and a willing licensee.

(11) Jenn-Air is entitled to damages for infringement of the 607, 357 and 647 patents measured by a reasonable royalty on the net selling price of the infringing items.

(12) On April 13, 1966, Jenn-Air and Greenheck Fan and Ventilator Company entered into a license agreement whereby Greenheck agreed to pay Jenn-Air a royalty of 4% of net sales of wall exhausters sold by Greenheck under the 607 patent. The license agreement providing for a royalty of 4% of net sales was consummated in connection with the settlement of a patent infringement suit instituted by Jenn-Air against Greenheck in 1963. Royalties were paid to Jenn-Air based on sales of the licensed product until 1968, at which time the 607 patent expired.

(13) The license agreement between Jenn-Air and Greenheck provided for a royalty of 4% of the net sales of the wall exhausters covered by the 607 patent. The term "net sales" was defined in such agreement as the price F.O.B. Greenheck's plant, less trade or quantity discounts. The term "F.O.B. plant" meant the price of the finished product as it rested on the manufacturer's loading dock, exclusive of freight charges.

(14) In the normal course of negotiations between a willing licensor and prospective licensee, the term "net selling price" is defined by the parties involved in the particular negotiations.

(15) We find as a fact that in defining the term "net selling price" for the purposes of applying a reasonable royalty rate, the cost of shipping the product would not be included by the fictional negotiators.

(16) The reasonable royalty which a willing licensor and a willing licensee would have agreed upon in the course of hypothetical negotiations would have been based on the net selling price of the products covered by the license agreement. Under the facts of this case, the term "net selling price" would not have included the cost of accessory items sold in connection with the sale of the infringing items. While the cost of the accessories would not be included in the net selling price for purposes of determining the amount due under the royalty agreement, the fact that the defendant would be able to sell the accessory products in conjunction with the sale of the patented products would be a significant factor in the hypothetical negotiations between Jenn-Air and Penn.

(17) In summary, the net selling price of the products covered by the license agreement, to which a reasonable royalty rate is applied, would not include the cost of freight or accessories but would include the amount of commissions paid on the sale of the products.

(18) Commissions paid to sales representatives are normal and necessary expenses incurred in the marketing and selling of a product and were in fact considered as such by Penn. The net selling price which Penn received from its customers in connection with the sale of the infringing products and against which a reasonable royalty rate must be applied is not reduced to exclude those amounts attributable to commissions for purposes of determining amount of damages.

(19) Throughout the accounting period involved here, Penn's sales of infringing products amounted to approximately 2.64% of Penn's total sales volume. Of a total sales volume of $113,194,125, the amount of infringing sales was $2,990,111.

(20) Penn's own financial statements establish that its overall operations resulted in a net profit to the corporation during each year covered by the relevant accounting period. The average annual net profit to the corporation during the accounting period (1963–1973) was approximately 3.73%. However, the average annual net profit for years 1963–1968 was 7.82%.

(21) Penn has failed throughout the entire period covered by this accounting to maintain separate and distinct accounts showing the profits it derived from the sales of the infringing products. The only accounting records kept by Penn are the above-described financial statements relative to profits derived from total sales.

(22) While the sales of the infringing items represented a minor portion of Penn's total sales during the accounting period (see finding of fact 19), Penn's infringing sales were not "additional" or "incremental" sales from the standpoint of cost accounting. Penn manufactured and sold the infringing sound control curbs from 1960 until shortly before the issuance of the injunction in September, 1972. The wall exhausters found to infringe Jenn-Air's 607 patent were first marketed by Penn in 1957, some five years prior to the beginning of the instant accounting period. Although clearly violative of Jenn-Air's patents, the manufacture and sale of the infringing products nonetheless constituted an ongoing and continuing segment of Penn's business. Therefore, the fixed costs of operating the overall power ventilating equipment business are attributable on a proportionate basis to the manufacture and sale of the infringing products. Consequently, the percentage of profits attributable to the infringing sales is substantially equivalent to the rate of profits derived from the sale of non-infringing items.

(23) There was no evidence of any commercial practice or business justification for placing the infringing sales in a special category subject to "direct cost" accounting or to allocating costs and expenses against such sales differently than for all of the other products that Penn was manufacturing in the same plants and selling through the same manufacturing representatives to

the same customers. On the contrary, the evidence demonstrated that throughout the accounting period such infringing wall exhausters and sound attenuating curbs were manufactured, priced, and sold on the same basis as all of Penn's other products. The infringing sales were only a small continuing part of Penn's overall business.

(24) During the accounting period, both parties sold on an average more than 40,000 power roof ventilators each year. In the same period, Penn sold annually about 10,000 roof curbs of all types, including approximately 850 "Ultra Sonotral Curbs" found to infringe Jenn-Air's 357 and 647 patents.

(25) At the outset of the infringement and during the accounting period, there were no non-infringing alternative wall exhausters available to Penn which would have been equivalent to Jenn-Air's sidewall exhauster in terms of effectiveness, cost and design.

(26) The wall exhauster manufactured by Loren Cook Company, while non-infringing, has not been shown to be an adequate and feasible alternative to Jenn-Air's wall exhauster. As Judge McLaughlin pointed out, " '607 has had and continues to have fine commercial success,"[2] and had special advantages not found in prior ventilators. The "Versavent" exhauster, the subject of Mr. Silver's testimony, was not marketed until late 1969 or early 1970, almost two years after the accounting period for the 607 patent had expired. Moreover, the "Versavent" was not functionally equivalent to the Jenn-Air wall exhauster.

(27) The Court also finds that there were no non-infringing attenuating roof curbs available to Penn during the accounting period. The acoustic curbs sold by Jenn-Air under patents 647 and 357 were "ten times more effective than any of the exhibits offered by defendant" in the infringement action. See, 464 F.2d at 52. At the outset of the ac-counting period, Penn was the only company that manufactured and sold an acoustic curb equivalent to the curb sold by Jenn-Air and Penn's product has been heretofore determined to be an infringement of Jenn-Air's patent.

(28) Penn's rate of profit from the year ended January 31, 1963, to the year ended January 31, 1968, is as follows:

1963—11.27%
1964— 5.86%
1965— 7.60%
1966— 6.51%
1967— 7.88%
1968— 2.96%

(29) Penn's usual and expected profit margin at the time the fictional negotiations for a license agreement would have occurred was in the area of 6 to 7%.

(30) A reasonable royalty, agreed upon by a willing licensor and a willing licensee, would have provided a fair return to Jenn-Air on its patent rights and would have enabled Penn to continue its manufacture and sale of the infringing curbs and wall exhausters and earn a reasonable profit from such sales.

(31) Jenn-Air's centrifugal sidewall exhauster, sold under patent 607, and Jenn-Air's single-baffle sound control curb and roof exhauster, marketed under patent 357, made a novel and substantial contribution to the power ventilating equipment field. The claimed inventions were extremely useful and effective in terms of ease of installation, reduction of noise level in the room ventilated, and the lowering of costs relative to the purchase and installation of power ventilator equipment.

(32) Jenn-Air and Penn are direct competitors, competing in interstate commerce in the sale of power ventilating equipment and related accessories for commercial, industrial, and institutional buildings. In view of the fact that the parties to this action are principal competitors in the supply of such equipment,

2. 464 F.2d at 49.

the ability of the licensee to market and sell the products covered by the patent in question would have reasonably resulted in the decrease of sales on the part of the licensor.

(33) In order to assist the Court in its determination of a reasonable royalty under the facts of this case, Jenn-Air called Wallace D. Newcomb, an able and experienced patent attorney, as an expert witness. Newcomb testified that a "reasonable royalty" under a license agreement to manufacture and sell products covered by the 607 and 357 patents would have been in the range of 8 to 10% of the net selling price. The above witness further testified that a license agreement under the 647 patent would have reasonably provided a royalty of 2 or 3% of the net selling price.

(34) Penn is a family-owned corporation founded in 1928 by three brothers, Samuel, Lewis and William Silver. The business entity known as Penn Ventilator Company, Inc., was converted from a partnership to a corporation in 1957 with no change in the day-to-day activities or operations of the company.

(35) At approximately the same time the company incorporated, a profit-sharing and pension program was established for all salaried personnel. Contributions to the accounts of those participants in the profit-sharing and pension programs are based on a fixed percentage of each member's annual income, provided that the corporation attains a pre-established level of profits for the year in question. At no time did the contribution exceed 15% of the employee's total annual income.

(36) During the relevant accounting period, the day-to-day operation and management of the company was in the hands of two family members, Robert Silver and Louis Malissa. Robert Silver was vice-president of Penn and head of its Philadelphia Sales Department which functions as the manufacturing representative for the territory of east-

ern Pennsylvania, New Jersey, and Delaware. Louis Malissa was also a vice-president of Penn and responsible for national sales, advertising, promotion, credit, and other operational areas.

(37) The compensation of Malissa for service rendered to the corporation was based on a percentage of total company sales. The rate of commission paid him by Penn has not changed since 1947. Robert Silver's annual salary is also based on a fixed rate of commission, as are all of Penn's manufacturing representatives.

(38) Both Robert Silver and Malissa, as well as other members of the Silver family who are employed by Penn, received during the accounting period substantial sums of money in the form of contributions to their respective profit-sharing and pension accounts. While the amounts paid annually into those accounts were considerable, the record is devoid of any evidence that the amounts paid to either Robert Silver or Malissa were not in return for services rendered to the corporation or in violation of applicable Internal Revenue laws.

(39) The Internal Revenue laws do not permit partnerships to establish and/or operate profit-sharing or pension plans for partnership employees. The record contains no evidence that the profit-sharing and pension plan established by Penn was ever subject to criticism or adjustment by the Internal Revenue Service.

(40) The accounting records accurately reflect the annual net profits of the corporation. Despite the fact that individual members of the Silver family personally received over the accounting period very substantial monetary benefits from the operation of the company in the form of salaries and company contributions to pension and profit-sharing programs, Penn has not forfeited its corporate status for purposes of this accounting action.

(41) Robert H. Silver and Louis G. Malissa were responsible for the day-

to-day operations and the long-range policy decisions of Penn. The nature and terms of a license agreement, including the royalty rate provided therein, would have been negotiated by and subject to the approval of either Malissa or Robert Silver, or both individuals.

(42) Penn's contribution to the profit-sharing plan was based on a certain percentage of the income of those individuals participating in the profit-sharing program. Annual income, in the form of commissions as far as Malissa, Robert Silver and other high-ranking officials of the corporation were concerned, was based on amount of sales made. Although the official corporate financial records reflected relatively low net corporate profits, the amount of benefits payable under the profit-sharing program was ultimately based on total sales, provided the corporation realized a profit for the year in question. For the above reason, Malissa and Robert Silver would have considered Penn's ability to sell the infringing and related non-infringing products when negotiating the license agreement.

(43) The mere existence of lawful profit-sharing and pension programs pursuant to which salaried personnel receive substantial monetary benefits based on a combination of annual income and corporate profits, does not provide sufficient justification for this Court to treat Penn as a *de facto* partnership for the purposes of awarding damages for patent infringement.

(44) The Court finds that no "established rate of royalty" existed with respect to the 607 patent either (a) at the outset of Penn's infringement when the hypothetical negotiations leading up to the license agreement between the parties are assumed to have occurred, or (b) at any other time prior to the expiration of the 607 patent in May, 1968.

(45) There is no evidence that any license was ever granted under either the 357 or 647 patent; therefore, no "established rate of royalty" existed with respect to either or both of the 357 and the 647 patents at any time.

(46) Hypothetical negotiations at the beginning of the accounting period between Jenn-Air and Penn would have resulted in a license agreement providing for a royalty of 4% of the net selling price of products covered by the 607 and 357 patents.

(47) A reasonable royalty under the 647 patent would have been 3% of the net selling price of items covered by such patent.

III. *Findings of Fact as to Reasonable Attorney's Fees and Interest*

(1) Penn willfully, wantonly, and deliberately infringed Jenn-Air patents 607, 357 and 647.

(2) Penn failed throughout the entire accounting period to maintain adequate financial and accounting records showing the profits made on sales of infringing items.

(3) The circumstances surrounding the instant litigation justify an awarding of reasonable attorney's fees to Jenn-Air. There can be no question that Penn manufactured and sold the sound control curbs and sidewall exhausters in full realization that the sale of such products violated Jenn-Air's rights under the 607, 647 and 357 patents. Penn's infringement was continuous, flagrant, and "unconscionable." See, 464 F.2d 48, 49 (3rd Cir. 1972). Jenn-Air has been forced to engage in an expensive and protracted litigation. To date, Penn has not asserted a meaningful defense to the merits of plaintiff's claim of infringement. In fact, the prior art defense advanced by counsel initially retained by Penn in connection with this matter was not even asserted in the infringement phase of this case.[3]

---

3. The defense of prior art was suggested by defense counsel in an opinion letter sent to Louis Malissa concerning Penn's infringement of Jenn-Air's 357 patent.

IV. *Findings of Fact as to Total Damages*

(1) 607 Patent—

| | | |
|---|---|---|
| | Total sales of Penn's "Wall Mounted Domex" units ............... | $1,233,740 |
| Cost of accessories ... $66,886 | | |
| and freight charges ... 80,113 | | |
| $146,999 ................. | | − 146,999 |
| | Net sales of "Wall Mounted Domex" units.. | $1,086,741 |
| Net sales ........ | $1,086,741 | |
| 4% royalty ...... | X .04 | |
| Damages ........ | $43,469.64 | |

(2) 357 Patent—

| | | |
|---|---|---|
| Total sales of Penn's "Ultra Sonotrol Curbs" (single-baffle) ..... | $642,046 | |
| Freight charges .... | − 41,691 | |
| Net sales .......... | $600,355........ | $ 600,355 |
| Total sales of Penn's roof exhausters (sold w/"Ultra Sonotrol Curbs") .............. | | $1,113,912 |
| Cost of accessories .... $60,901 | | |
| and freight charges ... 68,377 | | |
| $129,278 ..... | | − 129,278 |
| Net sales ............ | $ 984,634.... | + 984,634 |
| | Total net sales of "Ultra Sonotrol Curbs" and roof exhausters ........ | $1,584,989 |
| Total net sales ... | $1,584,989 | |
| 4% royalty ...... | X .04 | |
| Damages ........ | $63,399.56 | |

(3) 647 Patent—

| | | |
|---|---|---|
| | Total sales of Penn's "Ultra Sonotrol Curbs" (multi-baffle) ........ | $ 504,462 |
| | Freight charges ........ | − 32,800 |
| | Net sales of Penn's "Ultra Sonotrol Curbs" (multi-baffle) ........ | $ 471,662 |
| Net sales ........ | $ 471,662 | |
| 3% royalty ...... | X .03 | |
| Damages ....... | $14,149.86 | |

(4) Total damages—trebled——

|  |  |
|---|---|
| Patent 607 . . . . . . | $ 43,469.64 |
| Patent 357 . . . . . . | $ 63,399.60 |
| Patent 647 . . . . . . | $ 14,149.86 |
| Total damages . . . | $121,019.10 |
|  | X 3 |
| Trebled damages. . | $363,057.10 |

(5) Jenn-Air will be awarded $363,-057.30, together with interest on the above amount to be computed from the date of this Opinion to the date of payment at the rate of 6% per annum.

V. *Conclusions of Law*

(1) Jenn-Air is entitled to recover damages for Penn's infringement of patents 607, 357 and 647, together with interest and costs of litigation.

(2) Penn Ventilator Company, Inc., should not be treated as a *de facto* partnership for the purposes of awarding damages for patent infringement.

(3) In light of the willful and intentional infringement of Jenn-Air's rights under the three patents in question here, Jenn-Air is entitled to treble damages.

■ (4) The present action is an "exceptional case" within the meaning of 35 U.S.C. § 285, thereby justifying the award of reasonable attorney's fees to Jenn-Air.

*Discussion*

The computation and awarding of damages in this case involved the resolution of several important factual questions. The Court does not deem it necessary to discuss in detail each and every factual finding. Nonetheless, because of the relative complexity and significance of certain findings in connection with the assessement of total damages, limited discussion is appropriate.

■ *Plaintiff's contention that Penn should be considered as a de facto partnership for purposes of the accounting for patent infringement*—Other than the fact that the defendant established and maintained throughout the accounting period a profit-sharing and pension program in which all salaried corporate personnel participated, there was no evidence presented which would reasonably lead this Court to conclude that Penn should be treated as a *de facto* partnership for purposes of this accounting action. With respect to the question of whether Penn should be considered as a *de facto* partnership, Jenn-Air introduced the testimony of Ronald C. Jack, an accountant and management consultant employed by the firm of Ernst and Ernst. Jack testified that he reviewed certain accounting and financial records of Penn and that such a review indicated to him that "the corporation is operated as if it were a partnership." (N.T. 1–162)

The thrust of Jenn-Air's position in regard to the characterization of Penn as a partnership is that Penn's financial statements do not accurately reflect the gains and profits which Penn and the controlling Silver family members derived from the infringing sales and that it is necessary to recast Penn's financial reports in order to properly show the benefits received by Penn and the Silver family. Jenn-Air argues that by treating the corporation as a partnership and by eliminating the deductions taken for the salaries of the controlling family members and company contributions on their behalf to pension and profit-sharing programs, the "true" profits of the infringer will be revealed. In essence,

Jenn-Air would desire the Court to treat controlling members of the Silver family as partners in the *de facto* partnership and to consider the salaries and profit-sharing contributions made on their behalf as "profits" instead of a corporate expenditure deductible as a business expense.

■ The law in regard to the relevance of an infringer's profits is well settled. While a plaintiff in a patent infringement action is no longer entitled to recover the profits derived by the sale of the infringing items, the infringer's profits may constitute evidence tending to show the plaintiff's damages or be a relevant factor in the calculation of a reasonable royalty. See, Bigelow v. RKO Radio Pictures, 327 U.S. 251, 257–258, 66 S.Ct. 574, 90 L.Ed. 652 (1946); Zegers v. Zegers, Inc., 458 F.2d 726, 728 (7th Cir. 1972). In that an infringer's profits may be relevant to a determination of a reasonable royalty, Jenn-Air purports to show that Penn and members of the Silver family derived considerably greater monetary benefits than the corporation's financial statements disclosed.

Pursuant to a stipulation between the parties, certain trial exhibits were submitted to the Court under seal. These exhibits showed that substantial financial payments were made by the corporation to the profit-sharing and pension accounts of members of the Silver family who were employed by Penn during the accounting period. Robert Silver and Louis Malissa received sums much greater than did other members of the Silver family. The Court concludes that the operation and maintenance of a profit-sharing and pension program and the payment of funds into the accounts of the participants in such program does not warrant treating Penn as a *de facto* partnership for purposes of this accounting action.

■ The record is devoid of any evidence that the payments were not in return for services rendered to the corporation or in excess of the limits prescribed by the Internal Revenue laws. Jenn-Air failed to show that the contributions made under the profit-sharing and pension plans were at any time subject to adjustment or attack by the Internal Revenue Service. We do not disagree with Jenn-Air's contention that under certain circumstances it is appropriate to recast an infringer's financial statements in order to reveal the true status of the profits or advantages derived by it from its infringing operations. Such action, however, is not dictated by the evidence in this case.

In Graham v. Jeoffroy Mfg., 253 F.2d 72 (5th Cir. 1958), the court reconstructed the profits of the infringer by adding the salaries of two corporate officers to the profits of the company in order to obtain an accurate picture of the profits resulting to the company from the infringing sales. Two factors clearly distinguish the above-cited case from the one at bar. First, in the *Graham* case, the corporate officers whose salaries were added to the company's profits were both found by the trial court to be guilty of infringement along with their corporation. Second, the court in *Graham* found that 45% of the two officers' salaries resulted directly from the infringing activities. Members of the Silver family were not found personally liable for the acts of infringement in the instant case, nor is it possible to state that more than a very minor portion of the salaries and contributions to the profit-sharing accounts of the Silver family can be attributed to infringing sales. (See finding of fact 19.)

Absent evidence that the salaries paid and profit-sharing contributions made by the corporation were in fact a distribution of profits in disguise or were unreasonable or extraordinary in that they were not commensurate with the value of the services rendered, the Penn corporation cannot properly be treated as a *de facto* partnership for purposes of this accounting action. See, Clair v. Kastar, Inc., 70 F.Supp. 484, 488 (S.D. N.Y.1946).

**676**

*Reasonable royalty*—The Court's finding that the figure of 4% of the net selling price represents a reasonable royalty which a willing licensor would have accepted and a willing and prudent licensee would have paid to obtain a license to manufacture and sell the products covered by the 607 and 357 patents is based upon several evidentiary premises. There is no question that the sound control curbs and sidewall exhausters sold by Jenn-Air made a novel and substantial contribution to the prior art and enjoyed outstanding commercial success during the years of production. The functional utility of the products and advantages derived from the use thereof has been documented by the opinion of the Court of Appeals and is evidenced by the amount of sales of such products to commercial, institutional and industrial concerns as set forth in the present record.

■■ Nevertheless, the imposition of a reasonable royalty which does not allow the infringer "reasonable profit after paying the suppositious royalty" is basic error. Zegers v. Zegers, Inc., *supra*, 458 F.2d at 728 n. 8; Georgia-Pacific Corp. v. U. S. Plywood-Champion Papers, Inc., 446 F.2d 295, 299 (2nd Cir. 1971). At the time the hypothetical negotiations between the willing licensor and the willing licensee would have taken place, Penn's profit margin hovered in the range of 6 to 7% of total sales.[4] While Penn's rate of profit decreased during the later years of the accounting period, the Court must place greater emphasis on those factors which were apparent at the time of the hypothetical negotiations leading up to the license agreement. Georgia-Pacific Corp. v. U. S. Plywood-Champion Papers, Inc., *supra* at 297. A royalty of 4% would have allowed the infringer a reasonable profit after paying the suppositious royalty.

In light of all the evidence introduced in this case, including Jenn-Air's license agreement with the Greenheck corporation and Penn's reasonable expectation of collateral profits from the convoyed sales of non-infringing items sold in connection with the infringing sales, the Court deems 4% of the net selling price of the products covered by the 607 and 357 patents to be a reasonable royalty upon which the parties would have agreed in negotiating a license agreement.

■ *Treble damages*—Upon proof of the willful and wanton infringement of Jenn-Air's patents, the trial court may in its discretion award increased damages. Blake v. Bassick Company, 392 F.2d 879 (7th Cir. 1968); L. F. Strassheim Co. v. Gold Medal Folding Furniture Co., 294 F.Supp. 708 (E.D. Wis.1968). Stated differently, a patent owner is entitled to treble damages in a patent infringement action where the defendant had knowingly, deliberately and intentionally infringed the patent. Maxon Premix Burner Co. v. Mid-Continent Metal Prod. Co., 279 F.Supp. 164, 190 (N.D.Ill.1967). The Third Circuit, in reversing the District Court's finding of laches as to the 607 patent and noninfringment as to the 357 and 647 patents, described the defendant's infringement as "unconscionable," a "counterfeiting," and a "glaring misuse" of Jenn-Air's products.

In order to vindicate its rights under the three patents, Jenn-Air has been forced to indulge in protracted, vexatious and expensive litigation. Jenn-Air's discovery efforts have been hindered by a less than cooperative attitude on the part of Penn. The Third Circuit characterized Penn's defense to the claim of infringement as a "mock up" and "desperate effort" to avoid liability. Further, Penn has made no effort whatsoever to maintain separate financial records showing the profits which it derived from the sales of infringing products.

Based on the evidence presented during the infringement stage of this case,

4. Penn's expected profit margin before deduction of royalty payments was approximately 6% of sales. See, Defendant's Proposed Findings of Fact 82.

the findings of the Third Circuit, and this Court's findings in relation to the damage portion, we conclude that Penn willfully, intentionally, and knowingly infringed the patents in question. Accordingly, the damages awarded will be trebled.